Filed 10/4/21  In re T.M. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re T.M. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> N.M., <br><br> Defendant and Appellant. | G060012 <br><br> (Super. Ct. Nos. 17DP1325, 17DP1325A, 17DP1326, 17DP1326A, 17DP1327, 17DP1327A, 17DP1328, 17DP1328A, 17DP1329 and 17DP1329A) <br><br> O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Caryl Lee, Judge.  Affirmed.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, and Karen L. Christensen, Deputy County Counsel, for Plaintiff and Respondent.

\*          \*          \*

This dependency case, involving five siblings then aged 12, 11, 8, 6 and 3, was initiated by the Orange County Social Services Agency (SSA) in December 2017, after the children's mother (Mother) left them unattended overnight.  Custody was initially returned to Mother, but additional issues surfaced involving her mental health and substance abuse.  The children's father (Father), who was in custody when they were detained and had not visited them for two years, was later denied visitation.  The children were placed in foster care and both parents were offered reunification services.

After Father experienced success with his reunification efforts, the children were placed in his custody for a 60-day period near the end of the 18-month reunification period.  Ultimately, the dependency case was terminated with exit orders granting full legal and physical custody of the children to Father and granting monitored visitation three times per month to Mother.  She appeals, arguing the trial court abused its discretion by reducing the frequency of her monitored visitation from once per week to three times per month, without apparent reason, and by declining to grant her shared legal custody.

We find no abuse of discretion and affirm the exit orders.  A continuing feature of the reunification period in this case has been Mother's hostility to the idea of Father having custody of the children.  She repeatedly reported him to SSA for alleged misconduct, and she regularly disparaged him to the children, who made clear they disliked hearing it.  Evidence of this ongoing conduct was sufficient to support the trial court's implied finding that Mother would not be able to reasonably share parenting authority with Father.

There is no requirement that the juvenile court accept SSA's recommendation regarding visitation, or that it maintain the same frequency of visits that existed in the period prior to termination. In this case, the once-a-week visitation schedule claimed by Mother began only a month before the termination hearing, and Mother missed the first two sessions. Based on that evidence, the court could infer that scheduling visitation once per week was not in the best interests of the children.

## FACTS

On December 5, 2017, the Orange County Social Services Agency (SSA) filed a petition alleging general neglect and failure to protect and supervise the children. The petition alleged that on the night of December 3, and into the morning of December 4, Mother left the children unsupervised in a motel room. The petition also alleged that Mother has a history of mental health issues, and of domestic violence issues with multiple partners, including Father.

The petition alleged jurisdiction is appropriate on the basis that the children's maternal half-siblings were the subject of a prior dependency petition in which the court sustained allegations that Mother engaged in physical abuse of one of the half-siblings, and she had a criminal conviction in 2002 for willful cruelty to a child.

The petition further alleged Father has a history of mental health issues, which may interfere with his ability to safely parent his children, as well as a criminal history including convictions or arrests for making criminal threats and stalking. The petition also alleged Father was involved in a serious motorcycle accident approximately 15 years earlier, which may have resulted in a traumatic brain injury. The petition further alleged Father was the subject of four separate restraining orders, including one that benefits Mother, issued in March 2016 by the court presiding over the couple's marital dissolution.

3

Finally, the petition alleged that in March 2016, Mother was awarded sole legal and physical custody of the children in the marital dissolution action, while Father was allowed only professionally supervised visitation; Father had not visited the children since that time and the three older children reported they did not currently want visitation with Father.

In connection with the initial detention hearing, SSA reported Mother stated she and the children had recently been homeless, and she acknowledged leaving the children alone in a motel room overnight for up to seven hours. SSA's report also summarized the content of 26 prior referrals for abuse or neglect involving the family commencing in November 2005.

Father was incarcerated at the time the children were taken into protective custody; he was interviewed in jail on December 5, 2017. He indicated his incarceration stemmed from a charge that he had made a terrorist threat against Laura's House, a domestic violence shelter. He said he was a businessman and record producer with a "vocational history of underwriting loans as a mortgage specialist."

At the detention hearing on December 6, 2017, the court ordered the children detained from both Mother and Father. Mother was given supervised visitation. SSA's January report noted that after four days in custody following her arrest for leaving the children alone overnight, Mother's visitation was going well. Mother had obtained safe housing, appeared to demonstrate insight into the reasons the children were detained, and enrolled in services. On January 11, 2018, the children were released to Mother's custody.

Father was released from jail after pleading guilty to making criminal threats, stalking, and making telephone calls with intent to annoy. The children reported they had not seen Father in two years. The three oldest children responded they were not interested in visiting with him. In June 2018, SSA reported that Father had complained to them about the dependency proceeding and made disparaging remarks about Mother.

4

The court ordered a psychiatric evaluation of Father and subsequently entered an order denying him visitation. We affirmed that order on appeal. (*In re T.M.* (Feb. 15, 2019, G056588) [nonpub. opn.].)

In July 2018, SSA filed a petition to remove the children from Mother's custody because she had been placed on an involuntary psychiatric hold. Mother claimed without evidence the children had been poisoned. Mother acknowledged to a psychiatrist that she was using cocaine in addition to her attention deficit hyperactivity disorder (ADHD) medication.

In August 2018, the court ordered the children detained from Mother; she was allowed supervised visitation at a minimum of six hours per week. The visitation went well initially, but toward the end of the first month, the children reported that Mother was bringing up memories that made them feel uncomfortable and upset.

The court ordered psychiatric evaluations for both parents. Mother's first evaluation concluded she had thinking problems, odd beliefs, and likely delusions. Her second evaluation diagnosed her with a psychotic disorder, possible amphetamine abuse, and paranoid personality traits.

In May 2019, two of the children reported that Mother had brought food to visitation in a container decorated with blood on the outside. The oldest child also reported Mother gave him a birthday card with hearts drawn in blood, and cupcakes with pentagrams on them. Mother denied using blood to decorate the food box or card, but the court ordered Mother not to provide any food, and not to bring any letters, cards or books to visitation. Additionally, Mother's visitation was reduced to one hour per month, plus three phone calls per week.

In May 2019, Mother was arrested for trespassing; in June 2019, she was arrested and later released after she went to the oldest child's school to ask for his records and spilled coffee on the clerk's computer. Mother reported she had completed a parenting course; SSA was unable to confirm that claim. Moreover, Mother was

5

terminated from therapy after she missed three sessions. The therapist stated to the social worker that she was "scared of" Mother.

Additionally, Mother failed to enroll in substance abuse treatment, or participate in drug testing between February and June 2019.

By July 2019, the children were regularly visiting with Father and reported they were enjoying the visits and wanted to live with Father. Mother's visits were increased to twice per month in July 2019, and, although she missed a couple of visits and was in jail for a week on the trespass charge, the visits and phone calls were otherwise reported to be appropriate. The oldest child, however, refused to participate in visitation with Mother.

In September 2019, SSA reported that visitation continued to be appropriate. The report stated Mother was drug-testing, but she had not enrolled in a substance abuse class or attended any Narcotics Anonymous meetings. At the review hearing on September 19, 2019, the court authorized SSA to increase Mother's visitation, and allowed Mother to discontinue her Narcotics Anonymous meetings if she continued to test clean.

At the 18-month review hearing in January 2020, SSA recommended the court order a 60-day trial home visit with Father. Although all of the children except the eldest said they enjoyed visits with Mother, none of them wanted to live with her. The three eldest children stated they did not feel safe with Mother.

SSA reported that Mother's visitation schedule had been "the first, 2nd and 4th Friday of the month," and that she had been generally appropriate. The two older sons had participated in visits with Mother only three or four times during the reporting period, with the elder stating he did not have any desire to visit with her.

SSA reported Mother had stopped drug testing and had not yet enrolled in a substance abuse program. SSA also reported Mother had again been arrested in December 2019, on charges of causing fire to property in violation of Penal Code

6

section 452, subdivision (d), and procuring a false or forged instrument for filing or recording with the state in violation of Penal Code section 115, subdivision (a). As a result, she was again incarcerated.

The 18-month hearing was continued to March 2020, and the court ordered Mother's visitation reduced to once every two weeks while she remained in custody.

Mother was released from custody near the end of February 2020; before being released, she had a visit with the children during which she yelled at them and made derogatory remarks about Father. Following that visit, the eldest son and daughter reported they did not want to visit with her.

In connection with the continued hearing in March 2020, SSA reported the children's visits with Father were going well and recommended the children remain in his custody, that supervision be continued, and the case be scheduled for a six-month review. SSA reported all the children stated they did not want to be alone with Mother due to her saying inappropriate things about Father. SSA recommended termination of reunification services for Mother.

Mother's first in-person visit with the children after her incarceration was in March 2020. During the visit, Mother checked the youngest son's back, stated that she saw bruises, and insinuated he was being abused by Father. The children informed her that the child had "put handcuffs on the dog and the dog dragged him." Mother's concern was investigated as a possible child abuse incident which was determined to be unfounded. The day after the visit, Mother contacted the police to report that the eldest child had been choked by his paternal step-grandfather in 2017. The office asked her why she was reporting the incident two years later; she responded she was "just getting to it." When asked, the child denied the incident ever occurred.

According to SSA, between February and the reporting date of May 5, 2020, Mother contacted the Child Abuse Registry six times. One incident was determined to be "Unfounded," and the others were characterized as "Information Only."

7

About a week later, the second oldest child contacted the social worker to report her concern that Mother was trying to get the youngest child "taken away from them." She explained that during the most recent visit, the youngest child had told Mother that his back hurt and he was taking medication for it, but Mother would "stop[] at nothing to try to say [he] is being abused." The child contacted the social worker again the next day to report that Mother had made an unmonitored phone call to her from a private number. Mother made various disturbing allegations, about both the child and Father, and the child reported that the phone call "freaked her out and scared her."

Both of the older children reported that Mother was also attempting to contact them through social media. The second oldest child shared a message Mother had sent her via Tik-Tok, in which Mother acknowledged she was aware she was prohibited from contacting them, assured the child she would be coming to get them soon, and characterized the social workers as "full of shit" and corrupt[]."[1]

The children reported they are tired of Mother asking them questions about Father and disparaging him. Because of that, they sometimes do not like to speak with her during visits. In May 2020, the court ordered Mother to have no contact with the children outside of the court-ordered visitation.

The 18-month review hearing was continued multiple times; the hearing took place in June 2020. At the hearing, the court ordered termination of reunification services for Mother and ruled that return of the children to Father would not create a substantial risk of detriment to their safety, protection or physical or emotional well-being, and that the children's placement in foster care was no longer necessary.

---

[1] When questioned regarding whether she had tried to contact her children on social media, Mother testified the social worker's report was a lie. Specifically, she claimed "I believe my children are being forced to lie and I believe the social worker is lying."

The court ordered that Mother's visitation would continue, explicitly incorporating the visitation plan in SSA's March 5, 2020 report, which provided for monitored visitation three times per month, while allowing SSA to liberalize visits as to frequency, duration, and need for monitoring. The court also stated the children had the ability to terminate visits if they felt Mother was not communicating appropriately.[2] The court then set a six-month review hearing in December 2020.

Mother filed an appeal from the order terminating her reunification services, but the appeal was later dismissed.

In connection with the scheduled December 2020 hearing, SSA filed an addendum report stating it continued to recommend the dependency case be terminated with the children remaining in Father's custody, and that monitored visitation continue for Mother. SSA otherwise reported the children were overdue for annual check-ups, but Father explained he was unable to schedule two of the boys for checkups due to the insurer claiming it had not yet been a year since their last checkups. Father stated he would be able to schedule the appointments after December 11, 2020.

The six-month review hearing was continued to March 2021. In the final addendum report prepared in connection with that hearing, SSA continued to recommend that dependency proceedings be terminated and that the court should make exit orders. SSA reported all the children remained healthy and were doing well in Father's home. SSA noted the girls had dental examinations in January 2021, and the boys had physical examinations in February 2021. Father reported he was in the process of scheduling dental examinations for the boys and physical examinations for the girls.

SSA also reported Mother continued to visit the children via the videoconferencing app, and in-person visits had been approved starting February 1.

---

[2]    The court expressed its desire that visitation is "all about [Mother] and the children and doesn't involve [Father] at all because that's the point of the visitation."

9

However, Mother did not show up for the scheduled visit on February 1, leaving the children waiting at the visitation site. Following her no-show, Mother was asked to contact the social worker the morning of the next scheduled visit to confirm whether she would attend. She complied, informing the social worker she would not attend the visitation on February 8. The following week was a holiday, and the visitation site was closed; Mother was able to visit the children via the videoconferencing app. The following week, Mother had an in-person visit with four of the children, but the visit ended early because the children were hungry.

SSA also disclosed that multiple reports of possible neglect by Father were made by an unidentified party or parties. The first report was that the oldest child, then age 15, had been hit by a car while skateboarding with friends. The child had scrapes and bruises, and according to the reporting party, had passed out as a consequence of the accident. The child reportedly told Father about the incident, but Father did not take him for medical care or file a police report. When the child himself was asked about the incident by SSA, he stated the car was not going very fast, that the only injuries he suffered were some minor scrapes on his arm, that he had walked away from the accident and continued skateboarding, and that Father had offered to take him to the hospital, but he had refused. SSA concluded the allegation of neglect was unfounded.

Another incident, characterized as an "Information Only Report," involved a younger son who was observed to have a bald spot on his head "the size of a golf ball." It was suspected that he had been pulling at his hair because a hair gel he was using made the hair "hard." The child was also observed with a razor in his hand, saying he wanted to shave off his hair. When SSA followed up on the report, Father essentially confirmed the child had been pulling at his hair after his hair gel dried; Father said the child did not have access to a razor, although his older siblings did. Father stated he had discussed with the older children the need to keep razors away from the younger children.

10

Mother testified at the hearing. She stated she disagreed with SSA's recommendation because of "concerns with the safety and welfare of the children since the children were placed in [Father's] physical care." Most significant, in her opinion, was the fact that the oldest child had been hit by a car, passed out, and received no medical care. She was also concerned about the incident in which the youngest son had a "bald spot on the side of [his] head about the [size of a] golf ball . . . ." When asked whether there was any reason SSA needed to remain involved in the case, Mother responded, "[Father] has been diagnosed with bipolar type II, along with severe narcissistic personality disorder, [and] remains unmedicated."

Mother also described her last visit with four of the children a week earlier, in which they danced, talked about school and drew pictures. She stated that she believed her visitation schedule was "every Monday from the last message I received from the social worker." Mother claimed her visitation with the children was "very good [and] very needed." She acknowledged she had not participated in any drug treatment or individual counseling since June 2020, claiming she had "almost completed" drug treatment and that she would like to have more counseling provided by SSA if that were possible.

Following the close of evidence, Mother's counsel argued that due to the recent incidents involving the oldest son's skateboarding accident and the youngest son's bald spot, the dependency case should not be terminated with an order of custody to Father. In the alternative, counsel argued that if the dependency were terminated, the exit orders should give the parents joint legal custody because "there is no reason in this case why . . . the mother should not have joint legal custody."

On rebuttal, SSA's counsel reiterated that, as explained in its final report, it had investigated both of the recent incidents highlighted by Mother, and it was satisfied with Father's handling of both incidents.

11

The court's ruling was to adopt SSA's recommendation and terminate the dependency. The court gave both legal and physical custody of the children to Father; Mother was given supervised visitation for one hour three times per month, until further order of the court.

## DISCUSSION

"When a juvenile court terminates its jurisdiction over a dependent child, it is empowered to make 'exit orders' regarding custody and visitation. [Citations.] Such orders become part of any family court proceeding concerning the same child and will remain in effect until they are terminated or modified by the family court." (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1122-1123 (*T.H.*); §§ 364, subd. (c), 362.4.)

In fashioning the exit orders, the court's "focus and primary consideration must always be the best interests of the child." (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268,) The "'juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion . . . order[s] in accordance with this discretion.'" (*In re Corrine W.* (2009) 45 Cal.4th 522, 532.)

In deference to the juvenile court's broad discretion, we will reverse its exit order only ""''if we find that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.''"" (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.)

In this case, Mother contends the juvenile court abused its broad discretion in two ways. Her first contention is that the court erred by not giving her shared legal custody of the children. We disagree. While it is true that shared legal custody of children is preferred in situations where it appears the parents will be able to cooperate in making decisions about the children, a court is well within its discretion to order sole legal custody to one parent in cases where one or both parents demonstrate hostility toward the other.

12

This is such a case. The evidence demonstrates that Mother is openly hostile toward Father and has made repeated attempts to undermine him with both the children and with SSA. She testified at the 18-month hearing that if the children were returned to her custody, she would not want Father to have any visitation at all. Mother has consistently refused to credit the idea that the children want to live with Father and has made clear at every turn that she does not wish to "share" custody with him.

Indeed, Mother has repeatedly accused Father of abusing and neglecting the children, and she continues to insinuate he has done so in her opening brief on appeal. Despite the fact the record demonstrates SSA investigated the recent incidents she relies upon as a basis for claiming Father is not taking reasonable care of the children, and that SSA explained why it found those reports to be unfounded, Mother fails to acknowledge those events in her brief. That tactic undermines Mother's contention. We find no error in the juvenile court's order awarding sole legal custody to Father.

Mother's second complaint is that the juvenile court's exit orders specified that she should have visitation only three times per month, rather than the once-a-week schedule she testified was disclosed to her by the social worker just before the termination hearing. In her view, the court erred by *decreasing* her visitation without any explanation.

Again, we find no error. As Mother concedes, the most recent court order was for visitation three times per month, although the court did allow SSA to liberalize the visitation schedule in its discretion. And while it appears SSA did attempt to facilitate visitation on a once-a-week schedule in the month before the termination hearing, Mother missed the first two visits without apparent explanation. Thus, the juvenile court could have reasonably concluded that visitation every week was more than Mother could handle.

More to the point, however, because the visitation schedule the court incorporated into its exit orders was the same schedule it had in place before that time, there is no basis for Mother's complaint that visitation had been inexplicably restricted in the exit orders. It was not. The only thing that changed was the opportunity for SSA to liberalize the schedule. Since SSA was no longer to be involved in the case, and thus could no longer exercise that option, there was no basis to continue it.

Ultimately, with the termination of the dependency case, and thus the cessation of SSA's involvement, the only party remaining who might agree to a liberalization of Mother's visitation schedule is Father. However, as explained in *T.H.*, the juvenile court errs when it gives one parent the discretion to determine the other parent's visitation rights in an exit order. "The power to determine the right and extent of visitation by a noncustodial parent in a dependency case resides with the court and may not be delegated to nonjudicial officials or private parties" and that "rule of nondelegation applies to exit orders issued when dependency jurisdiction is terminated." (*T.H., supra*, 190 Cal.App.4th at p. 1123.) Consequently, in *T.H.*, the appellate court reversed an exit order that effectively gave the mother a veto power over the father's visitation schedule. We cannot conclude the court in this case erred by declining to do what was found to be error in *T.H.*

Based on the foregoing, we find no error in the juvenile court's exit orders.

## DISPOSITION

The contested orders are affirmed.


GOETHALS, J.

WE CONCUR:


O'LEARY, P. J.


FYBEL, J.